# UNITED DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH HIGHLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CV00133 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the
Commissioner of Social Security denying Plaintiff Kenneth Highley's application for
disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-
434, and Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381-
1384f. For the reasons set forth below, the decision of the Commissioner shall be
affirmed.

Plaintiff, who was born on June 20, 1978, applied for benefits on January 7, 2004,
claiming a disability onset date of August 1, 2003, due to hepatitis C, high blood
pressure, bipolar disorder, anxiety disorder, borderline schizophrenia, constant fatigue
and weakness, paranoia, nervousness, and right-side back and leg pain. His applications
were denied at the initial administrative level based upon a finding that he was currently

---

[1]     The parties have consented to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

disabled due to drug addiction, and that his non-drug and non-alcohol related impairments would not be of disabling severity. Tr. at 58. Pursuant to Plaintiff's request for a hearing before an Administrative Law Judge ("ALJ"), a hearing was held on April 19, 2005, at which Plaintiff was represented by counsel. On June 21, 2005, the ALJ issued a decision that Plaintiff was not disabled as defined by the Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on December 22, 2005. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ (1) erred in giving undue weight to the opinion of a nurse practitioner (Donna Bond) and in failing to develop the record with regard to that opinion; (2) failed to consider properly Plaintiff's subjective complaints, in assessing his residual functional capacity ("RFC"); (3) confused "simple" work with "unskilled" work, in determining that Plaintiff could perform his past relevant work; and (4) failed to obtain the testimony of a vocational expert ("VE"), which was required in light of Plaintiff's significant non-exertional impairments.

## BACKGROUND

### Work History

Plaintiff's application forms show that he worked from December 1994, at age 16, to July 2003 at numerous short-term jobs including factory worker, construction worker, and cook/dishwasher/cleaner in fast-food restaurants. Tr. at 134-37. His earnings records show minimal and sporadic earnings. Tr. at 72-122. The record also indicates

that Plaintiff was in prison from November 20, 2002, until March 3, 2003. Tr. at 320-35. There was no evidence that Plaintiff had engaged in substantial gainful employment since mid to late 2003. Tr. at 81, 95, 134. Plaintiff had been married since 1996, and at the time of his application, had three children. Tr. at 128.

**Medical Record**

The record indicates that Plaintiff had psychiatric problems, including depression and fits of rage, from an early age. In a letter dated March 9, 2004, Plaintiff's mother wrote to his caseworker that Plaintiff had been admitted to a psychiatric hospital between the ages of nine and eleven due to these fits of rage and depression. He was diagnosed with bipolar disorder and began using drugs while in high school. Tr. at 153-56.

On April 8, 2001, Plaintiff was seen at the emergency room after having been up for several days on methamphetamine. Plaintiff was seen the next day by Tomas Espinosa, M.D. Plaintiff's primary complaint was noted as "substance abuse, methamphetamines." His past psychiatric history was noted as involving depression and self-mutilation with a diagnosis of manic depression. Dr. Espinosa indicated that Plaintiff had a loss of memory, which was binge-induced; mood swings; hallucinations; a little loss of concentration; and depression. At the same time, it was noted that Plaintiff's general behavior, level of consciousness, thought content, and emotional status were normal. Tr. at 297-309.

Plaintiff was discharged from the hospital on April 15, 2001. The discharge summary noted that Plaintiff had been diagnosed with bipolar disorder at the age of 13,

3

and was given a program of medications for this, but did not follow it. He was currently abusing drugs, particularly marijuana, amphetamines, and cocaine. He had been seeing a therapist for anger management, pursuant to a court order following an incident of "road rage." Throughout his hospitalization, Plaintiff was treated with Lithium, Zyprexa, and Neurontin. Dr. Espinosa reported that upon discharge, Plaintiff would admit himself to a rehabilitation unit. Plaintiff's final diagnosis was substance abuse, methamphetamines; and personality disorder, antisocial. Tr. at 297-98.

The record contains the prison medical records for Plaintiff from November 20, 2002 until March 3, 2003. When Plaintiff was first incarcerated, he was noted as being on psychiatric medications, and while in prison, his medications included Lithium, Trazodone, and Amitriptyline. The records from February 13, 2003, indicate that Plaintiff had hepatitis C, but was not a candidate for interferon and/or ribavarin therapy due to his failure to meet the established criteria. Tr. at 320-35.[2]

Plaintiff was seen by Tammy Watz, R.N.,[3] on September 4 and September 12, 2003. On September 4, Ms. Watz noted fatigue, rule out hypertension; and history of bipolar disorder. Her assessment on September 12, was hypertension, hepatitis C, and history of bipolar disorder. Tr. at 346-53. On November 25, 2003, Bruce Bacon, M.D.,

---

[2] The record also includes the prison medical records for another individual. Tr. at 311-19.

[3] This individual's name appears variously in the record as Watz, Watts, and Wattz. The Court will use the first spelling.

with SLUCare's Division of Gastroenterology and Hepatology, saw Plaintiff for his hepatitis C virus ("HCV"). Dr. Bacon noted that Plaintiff had been diagnosed with HCV eight months earlier. Plaintiff's current medications were listed as Trazodone, Elavil, and Lithium. Plaintiff was assessed with chronic hepatitis C, and was to follow up for laboratory studies. Tr. at 341-42. By letter dated December 3, 2003, Dr. Bacon reported to Ms. Watz that laboratory studies showed normal liver enzymes, that several other studies were pending, and that when all the information was compiled, decisions about treatment would be made. Tr. at 336-37.

Plaintiff was seen by Ahmad Zubairi, M.D., on January 19, 2004, with complaints of feeling depressed and anxious. Plaintiff wanted to see a psychiatrist to get back on his medications, which he said he had been taking up until eight or nine months prior to his visit with Dr. Zubairi. Plaintiff indicated feeling stressed, as he had recently been diagnosed with hepatitis C and faced a year of treatment. He had poor energy, concentration, and appetite, and said that he had relapsed into substance abuse one month prior and had been using methamphetamine daily. He indicated having suicidal thoughts in the past, which he did not act on. He said that he felt particularly anxious when he left his home, as he felt people were looking at him, laughing at him, and plotting against him. Plaintiff reported a history of at least three psychiatric admissions. Tr. at 293-94.

Plaintiff reported working in a factory up until five months prior, and that he was currently looking into disability income so that he could get back on his feet by getting treatment for his hepatitis C and depression. Plaintiff reported using cocaine, marijuana,

5

methamphetamine, and alcohol in the past, and said that he stopped drinking alcohol when he found out about his hepatitis C. He had been in rehabilitation before and wanted to go back. Tr. at 294-95.

On mental status examination, Plaintiff was found to be calm, cooperative, and verbal. However, he did not make much eye contact. His speech was generally clear, coherent, well-articulated, goal-directed, and without any thought disorder. There was no evidence of psychotic symptoms. On cognitive testing, Plaintiff was found to be oriented to time, place, and person. His recent and long term memory appeared intact, and his intelligence appeared average. Dr. Zubairi diagnosed Plaintiff with depressive disorder NOS (not otherwise specified), polysubstance abuse, antisocial personality traits, hepatitis C positive, and a current Global Assessment of Functioning ("GAF") score of 60.[4] The plan was for Plaintiff to be admitted to an outpatient clinic. He was started on Lexapro for depression and Trazodone for insomnia. Plaintiff said he would also look into getting counseling and that he would enter a rehabilitation program. Tr. at 295-96.

A Psychiatric Review Technique Form was completed by Lisa Lacey, D.O., a non-examining, consulting psychiatrist, on March 9, 2004. Based upon her review of the

---

[4] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31 to 40 reflect "major" difficulties in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" difficulties in these areas; scores of 51 to 60 indicate "moderate" difficulties; scores of 61 to 70 indicate "mild" difficulties.

record, she determined that Plaintiff met the listing for affective disorder (listing 12.04) in the Commissioner's listings of presumed-disabling impairments (found at 20 C.F.R., Pt. 404, Subpt. P, App. 1), but that drug abuse and alcoholism were material. With drug and alcohol abuse considered, Plaintiff was found to have marked restrictions of activities of daily living, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Lacey noted that without drug and alcohol abuse, there were no such restrictions and difficulties. Tr. at 157-68.

In narrative form, Dr. Lacey found that Plaintiff's allegations of disabling symptoms were partially credible, but that drug abuse and alcoholism were material. She opined that if Plaintiff abstained from substance abuse, his symptoms would likely resolve, and he would be able to understand and follow simple to complex instructions, relate appropriately to others in a work environment, make work related decisions, and adapt to routine changes common to the competitive work environment. Tr. at 169.[5]

As noted above, also on March 9, 2004, Plaintiff's mother wrote a letter outlining his psychiatric problems from an early age. She also wrote that he was "still a very depressed person," and for the past few years, did not like going out at all. She wrote that he could not deal with the real world and that this was why he could not hold a job. Tr. at 253-56.

_____

[5] The record includes a March 12, 2004 physical RFC assessment by a non-examining, non-medical source. Tr. at 144-151.

At a follow-up appointment with Dr. Bacon on April 27, 2004, for Plaintiff's HCV, it was noted that Plaintiff was experiencing fatigue. Tr. at 277. By letter dated May 3, 2004, Dr. Bacon wrote to Donna Bond, a mental-health nurse with Pathways Community Healthcare, Inc. ("Pathways"), that Plaintiff had "chronic hepatitis C with HCV, . . . with a very low viral load." Dr. Bacon wrote that Plaintiff's liver enzymes were normal and that Plaintiff had an excellent chance to cure his hepatitis C with a six-month course of antiviral therapy. Tr. at 276. Dr. Bacon wrote a similar letter to Ms. Watz on June 1, 2004, noting that Plaintiff agreed to start on interferon treatment and would attend a class on side-effect management and injection technique, and follow up with Ms. Rebecca Wilkins, Dr. Bacon's physician's assistant. Tr. at 271.

Plaintiff was seen by Dr. Bacon for follow up on July 15, 2004. It was noted that Plaintiff had received his first interferon injection on June 18, 2004. Plaintiff was found to have fatigue, weakness, constipation, irritability, anxiety, and to be bipolar. Tr. at 269-70. By letter to Ms. Watz, dated July 16, 2004, Dr. Bacon reported that Plaintiff had completed five weeks of treatment. Plaintiff's most significant side effects included shortness of breath with exertion, and irritability. Plaintiff was scheduled to see a new psychiatrist in one week.[6] His blood pressure was 122/75, his physical exam was "unremarkable," and Dr. Bacon noted that Plaintiff was exhibiting "a somewhat fair tolerance of his treatment." Tr. at 268.

_____

[6]     The record contains no evidence regarding whether Plaintiff saw a new psychiatrist.

Ms. Bond completed a multi-axial diagnostic evaluation on July 27, 2004, diagnosing Plaintiff with bipolar disorder, depression, hepatitis C, and a GAF score of 48. Tr. 247-53.  On July 28, 2004, Susan Jenner, M.A., a supervisor at Pathways, "recorded" this diagnosis, noting a GAF of 38.  Tr. 235-36.  When Plaintiff saw Ms. Bond on August 24, 2004, he reported feeling irritable, edgy, uneasy, and that he awakened every hour for about 15 to 20 minutes.  He had complaints of anxiety, but denied significant depression. His blood pressure was 134/73.  Zyprexa was increased and Wellbutrin was continued. Ms. Bond noted Plaintiff's history of cocaine and methamphetamine dependence.  Tr. at 245-46.

Plaintiff was seen by Dr. Bacon on September 21, 2004, for follow up for his hepatitis C.  Dr. Bacon noted that Plaintiff had fatigue, weakness, irritability, and anxiety, and was bipolar.  Tr. at 266-67.  By letter to Ms. Watz, dated September 21, 2004, Dr. Bacon reported that Plaintiff had completed 15 weeks of his hepatitis C treatment, and would continue on the regimen for a total of 24 weeks, ending on November 26, 2004. He said that Plaintiff reported doing much better with regard to his anxiety and irritability since he was started on Wellbutrin and Zyprexa.  Plaintiff's blood pressure was noted as 146/82.  Tr. at 265.

On October 19, 2004, Plaintiff was again seen by Ms. Bond.  Plaintiff believed that the increase in Zyprexa helped reduce his irritability and improve his sleep and anxiety, though all these symptoms were still somewhat present.  Plaintiff was still waking about three times per night and taking about thirty minutes to return to sleep, and

feelings of being a little depressed would come and go.  Plaintiff engaged in little activity because of his hepatitis C treatments, and he felt tired a lot.  Things were going well with Plaintiff's wife and their three children, and there was another child on the way.  Plaintiff reported that he was still having some cravings for drugs, but that he intended to stay clean.  Plaintiff's blood pressure was 147/77.  Wellbutrin was increased to further help correct sleep disturbance, irritability, and depression; Trazodene was prescribed temporarily until the Wellbutrin was fully in place; and Zyprexa was continued.  Tr. at 242-43.

Ms. Bond's November 16, 2004 treatment notes state that Plaintiff was somewhat depressed due to some "less than good" news on recent laboratory testes, but otherwise had been doing better.  His sleep improved, his mood swings were not as bad, and he was less irritable.  His blood pressure was 146/89.  Plaintiff's mental status  was "essentially unchanged."  He was assessed as having little or no risk of harm to himself or others.  Wellbutrin was increased, and Plaintiff was started on Risperdal on a trial basis.  Tr. at 239-40.

A physical RFC questionnaire was completed by Dr. Bacon on December 6, 2004. He listed Plaintiff's symptoms/side effects of his treatment as including fatigue, shortness of breath with exertion, decreased energy and endurance, headaches, irritability, and memory and concentration difficulties.  Dr. Bacon indicated that Plaintiff was not a malingerer, and that Plaintiff's impairments had lasted, or could be expected to last, at least 12 months.  Emotional factors were believed to contribute to the severity of

Plaintiff's symptoms and functional limitations. It was noted that anxiety and irritability affected Plaintiff's physical condition, and that he had frequent interference with attention and concentration needed to perform even simple work tasks. Plaintiff's ability to tolerate work stress as well as the degree to which he was capable of sitting, standing, and walking, were said to be difficult to assess in a patient with liver disease. Dr. Bacon wrote that the earliest date the symptoms and limitations noted in the questionnaire applied was June 18, 2004. Tr. at 259-63.

Plaintiff was seen again by Ms. Bond on December 21, 2004. He reported doing "pretty good," with mild mood swings and irritability occurring maybe a couple of times per week. Plaintiff's blood pressure was 149/90. His mental status exam indicated that he was alert, pleasant, cooperative, and appropriate. Although he initially avoided eye contact, that improved by the end of the session. His speech and psychomotor activity were found to be within normal limits, with mood noted to be a little stressed sometimes. Affect was blunted to smiling by the end of the session. Thoughts were found to be appropriate, logical, and organized, with no evidence of psychoses; memory was found to be fair; insight and judgment were found to be intact. Because Plaintiff was having difficulty with the insurance company regarding his prescription for Wellbutrin, that medication was decreased and his Risperdal and Trazodone were increased. Tr. at 236-37.

Sometime after December 21, 2004, and before February 15, 2005, Ms. Bond completed a mental RFC questionnaire.[7] She indicated that Plaintiff had bipolar disorder, hepatitis C, was depressed, and had a history of cocaine and methamphetamine dependence. His current, as well as his highest GAF in the past year, was assessed as 70. His mood had stabilized and his anger outbursts were mild and minimal, but his sleep had not stabilized. It was also noted that Plaintiff had remained off all street drugs and alcohol. Fatigue was the only recognized side effect from his medications. When asked what clinical findings demonstrated the severity of Plaintiff's mental impairment and symptoms, Ms. Bond noted anger outbursts, irritability, and mild recent memory deficit. The prognosis was good. Ms. Bond checked the following as Plaintiff's signs and symptoms: decreased energy, thoughts of suicide, feelings of guilt or worthlessness, impairments in impulse control, mild generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes), emotional lability, mild memory impairment, and sleep disturbance. Tr. at 286-87.

---

[7] On the line asking for the date the questionnaire was completed, Ms. Bond wrote July 27, 2004, apparently in answer to the printed question above the line asking for the earliest date that Plaintiff's limitations applied. Tr. at 290. Ms. Bond noted on the questionnaire that she last saw Plaintiff on December 21, 2004. Her next documented session with Plaintiff was on February 15, 2005, thus indicating the time frame within which the form was completed.

Ms. Bond also completed a check-box form concerning Plaintiff's mental abilities and aptitudes to do unskilled work. She noted that Plaintiff's ability was unlimited or very good in the following areas: carry out very short and simple instructions, maintain regular attendance and be punctual within customary limits, sustain an ordinary routine without special supervision, make simple work-related decisions, and ask simple questions or request assistance. Plaintiff's ability was limited but satisfactory with regard to: remember work-like procedures, understand and remember very short and simple instructions, maintain attention for a two hour segment, work in coordination with or proximity to others without being unduly distracted, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, be aware of normal hazards and take appropriate precautions. Ms. Bond assessed Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms as being either limited but satisfactory, or seriously limited, but not precluded. With regard to Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors, Ms. Bond put a question mark in the box "limited but satisfactory." Tr. at 288.

Ms. Bond also filled out a check-box form regarding mental abilities and aptitudes needed to do semi-skilled and skilled work. She found that Plaintiff had a limited but satisfactory ability to do the following: understand and remember detailed instructions,

carry out detailed instructions, set realistic goals or make plans independently of others, and deal with stress of semi-skilled and skilled work.  Tr. at 289.

In a form dealing with mental abilities and aptitudes needed to do particular types of jobs, Ms. Bond indicated that Plaintiff had a limited but satisfactory ability to do the following: interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  With regard to Plaintiff's ability to travel in unfamiliar places and use public transportation, Ms. Bond put a question mark between the boxes limited but satisfactory, and seriously limited, but not precluded.  Tr. at 289.

Ms. Bond found that Plaintiff did not have a low IQ or reduced intellectual functioning.  She indicated that Plaintiff's psychiatric condition exacerbated his experience of pain or other physical symptoms because he worried about his hepatitis C. Ms. Bond noted that the effect of Plaintiff's impairments or treatment on his ability to be at work would depend on the situation.  It was indicated that Plaintiff's impairments had lasted or could be expected to last at least 12 months.  Ms. Bond noted that Plaintiff was not a malingerer and that Plaintiff's impairments were reasonably consistent with symptoms and functional limitations described in the evaluation.  Tr. at 289-90.

Plaintiff was seen on January 4, 2005, for follow up for his hepatitis C.  Ms. Wilkins reported that Plaintiff's side effects from treatment were slowly resolving, including an improved appetite.  Plaintiff had zero complaints at this time.  Tr. at 229.

Ms. Bond treated Plaintiff on February 15, 2005, which was twelve days after Plaintiff's new baby was born.  At this time, Plaintiff had finished his hepatitis C treatment, and while he had to have more testing, it was thought to be in remission. According to Ms. Bond's treatment notes, Plaintiff reported that he slept okay, that his mood was pretty nervous, but that he had calmed down since the baby, and that he was taking Trazodone during the day a couple times a week and using it regularly at night. Plaintiff's blood pressure was 140/96.  Plaintiff's problems list included bipolar disorder, anxiety, and hepatitis C.  Tr. at 227-28.

**Evidentiary Hearing of April 19, 2005**

Plaintiff, who was represented by counsel at the April 19, 2005 hearing, testified to the following.  He resided with his wife and four children (ages eight, six, two, and three months), had completed the 11th grade, and had received vocational technical training in carpentry while in high school.  He took GED classes while he was incarcerated and took a pre-test for his GED and again some classes a year prior to the hearing.  Tr. at 374-76.

Plaintiff's work experience included a number of short, assembly-line type jobs in factories and as a cook and dish washer at a fast food restaurant.  He could not recall when he worked at one of the factories, but the ALJ stated that according to the record, Plaintiff worked there at least until November 15, 2003, which was after Plaintiff's alleged disability onset date.  Plaintiff's last job was at a funeral home.  All his jobs were full-time except for one of the factory jobs.  Plaintiff also performed volunteer lawn care

15

for a senior citizens home near his house.  At the time of the hearing, Plaintiff was taking care of his children while his wife worked.  Tr. at 376-80.

Plaintiff had been in jail once (from July to August 1995), and prison three times (from 1995 to 1996, from 1999 to 2000, and from 2002 to 2003), all related to drug use. He had undergone rehabilitation as an inpatient four times, most recently in 2004.  He also had outpatient care for drug counseling in 2004, and was hospitalized for a drug overdose either in 2000 or 2002.  Plaintiff testified that he was not currently consuming any alcohol or illegal drugs.  The only drugs he was using were prescription drugs prescribed by his psychiatrist.  At the time of the hearing, he was not on any pain medication.  Tr. at 381-84.

Plaintiff stated that his physical impairments included finger numbness, trouble walking for long periods of time, back and stomach problems, migraines, nausea, cold sweats, and fatigue.  He recounted being diagnosed with HepatitisC and his interferon treatments, which lasted for six months and terminated four months prior to the hearing. Plaintiff noted the following side effects from the interferon treatments: insomnia, dizziness, fatigue, vomiting, constipation, diarrhea, lost weight, mouth sores, loss of hair, shortness of breath, and headaches.  He was still enduring some of the side effects, including nausea, constipation, trouble sleeping, and depression.  Dr. Bacon informed Plaintiff that he would experience side effects for six to twelve months after treatment ended.  Due to the interferon treatments, Plaintiff went from 235 pounds to 175 pounds. At the time of the hearing, he was back up to 210 pounds.  Tr. at 384-86.

16

Plaintiff stated that he started experiencing finger numbness about a year prior to the hearing, and that it occurred at random times once or twice a week. The first two fingers and the tips of his thumbs would go numb on each hand, lasting for about two days. Due to this numbness, he could not get a good grip on things and thus, dropped things such as cups of coffee, and had trouble picking up things such as boxes. He also had trouble walking around, which he thought was due to dizziness and shortness of breath. If he walked around the block or went up a flight of stairs, he would have to stop and catch his breath. This started about the time of his Hepatitis diagnosis, which he believed was around November 2003. Tr. at 387-89.

Plaintiff testified that his physical impairments also included back problems, stomach problems, and migraines. His back problems, involving cramping, and lower back and posture problems, did not disrupt any of his activities. His stomach problems, which existed since the interferon treatments, included "really bad" heartburn, indigestion, and constipation one day and diarrhea the next. Every couple of weeks he got very bad blinding headaches from the back to the top of his head, which he referred to as migraines. These migraines lasted from one to four hours. Sometimes he used Excedrin, but usually he would lie down with a wet rag over his head and the lights out until the migraine ran its course. The migraines started around the time of the interferon treatments and have continued since treatment ended. Tr. at 389-91.

Plaintiff insisted that he was not on methamphetamine during the interferon treatment. His mental problems were that he was manic depressive, bipolar, and had

anxiety disorder. He was diagnosed as manic depressive at age nine or ten, and since July 2003, he had been very depressed, experiencing thoughts of suicide and episodes where he was delusional, paranoid, scared, and not able to go to public places like grocery stores or restaurants. Currently, he was taking Trazodone, Wellbutrin, and Risperdal for his manic depression. These medications helped regulate his mood and kept him calmer, but sometimes did not work. He experienced good and bad months. During the 11 months that he went for counseling, he had three episodes, lasting for about two weeks each, when he was in a panicked state, experiencing nerve disorders, and having a lot of trouble sleeping. Plaintiff also reported having anxiety attacks when he had shortness of breath, felt like the room started "closing down," "freaked out," and sometimes even passed out. He did not know what triggered these attacks. He had two of these episodes during the year of the hearing, and had been experiencing them and taking medication for them his entire life. He testified that his illegal drug use was usually a way of self-medication when he could not afford his medication or the insurance to get it. Plaintiff stated that he was able to care for his children despite his gripping problems due to his finger numbness. Tr. 389-96.

**ALJ's Decision of June 21, 2005**

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since November 22, 2003. He then found that the evidence established that Plaintiff's "medically determinable combination of impairments, a history of hepatitis C, hypertension, a depressive disorder, and a history of substance abuse," constituted a

18

severe combination of impairments. The ALJ determined, however, that none of these impairments, individually or in combination, equaled the requirements of any deemed-disabling impairments listed in the Commissioner's regulations. The ALJ proceeded to assess Plaintiff's RFC, noting that Plaintiff's credibility regarding his symptoms had to be considered under the relevant factors as set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984). The ALJ said that if the allegations most favorable to Plaintiff were fully credible, then it was clear that Plaintiff would not be able to work. The ALJ stated, however, that the allegations were not self-proving. The ALJ noted that there were few third-party observations corroborating Plaintiff's complaints, and that the medical record could be given more weight than Plaintiff's testimony. Tr. at 11-14.

The ALJ concluded that Plaintiff's allegations of symptoms precluding all significant gainful activity for 12 consecutive months were not credible. Tr. at 17. In reaching this conclusion, the ALJ found that Plaintiff's liver disease "was not very severe" and that while Plaintiff tested positive for hepatitis C, his treating specialist stated that Plaintiff had a relatively mild case of the disease. Furthermore, by September 21, 2004, after 17 of the planned 24 interferon treatments, Plaintiff had no detectable hepatitis C virus. The ALJ found that Plaintiff's hypertension also did not interfere with his ability to work. Next, noting Plaintiff's long history of polysubstance abuse, the ALJ concluded that the abuse was in remission and thus did not interfere with his ability to work. Further, according to the ALJ, Plaintiff's social functioning, activities of daily living, concentration, and persistence or pace were no more than mildly impaired by a

19

mental impairment. The ALJ noted that Ms. Bond reported, after seeing Plaintiff from July to December 2004, that Plaintiff's current GAF was 70. According to the ALJ, the treatment records showed a GAF of 38 "on a number of occasions." Plaintiff would be disabled if he persisted at such a level of functioning. But, again according to the ALJ, this low score was given on July 28, 2004, by Ms. Jenner, who had not been treating Plaintiff on a regular basis, as had Ms. Bond. Thus, the ALJ stated that Ms. Bond's score was entitled to more weight. Further, the ALJ noted that the GAF of 60 assigned (by Dr. Zubairi, on January 19, 2004) when Plaintiff was using illegal drugs and before Plaintiff commenced regular mental health treatment, was supportive of Ms. Bond's assessment of 70, after he was in treatment and not abusing drugs. Tr. at 14-16. The ALJ recognized that, as a therapist, Ms. Bond was not an acceptable medical source for establishing a medically determinable impairment under 20 C.F.R. § 404.1513(a). He noted, however, that her reports and records were considered in determining the severity of Plaintiff's mental impairment and how it affected his ability to work. Tr. at 19 n.8.

The ALJ considered that Plaintiff had complained of severe side effects from his interferon treatment, but found that there was no evidence "showing that severe debilitating symptoms could reasonably be expected to last for 12 continuous months following the discontinuation of therapy." Instead, the evidence indicated that the side effects were resolving, as it was reported (by Dr. Bacon) on January 4, 2005, that Plaintiff's appetite had improved, and that he was not bothered by fatigue or other side effects. As Dr. Bacon had indicated that Plaintiff's significant symptoms from the

20

interferon treatments had commenced on June 18, 2004, these symptoms did not meet the 12-month durational requirement. Tr. at 16.

The ALJ found that there was no medically determinable impairment to account for Plaintiff's complaint of hand numbness. The ALJ also noted that Plaintiff's daily activity of taking care of four young children, including an infant, was fairly demanding physically and emotionally. The ALJ found that Plaintiff retained the RFC for a full range of light work.[8] The ALJ stated that due to Plaintiff's mental impairments and history of substance abuse, he was restricted to simple work. The ALJ concluded that Plaintiff had not sustained his burden of proving that he could not perform his past relevant work as a fast-food worker and factory worker, both of which were simple and light work. Tr. at 16-17.

The ALJ noted that had Plaintiff met this burden, the burden would have shifted to the Commissioner to show that there was other work in the national economy that Plaintiff could perform. The ALJ explained that in light of Plaintiff's exertional ability to

---

[8]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls. Social Security Ruling (SSR) 83-10 elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours in an eight hour work day, while sitting may occur intermittently during the remaining time; and that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. SSR 83-10, 1983 WL 31251, at *6 (1983).

do light work and his vocational factors (age, education, and work experience), Rule

202.17 of the Commissioner's Medical-Vocational Guidelines found at 20 C.F.R., pt.

404, subpt. P, app. 2 ("Guidelines"), would direct a conclusion of not disabled. The ALJ

then stated that Plaintiff's limitation to simple work did not "compromise his ability to

perform any of the jobs administratively noted by Rule 202.17." Thus, the ALJ

concluded that Plaintiff was not disabled because he could perform his past relevant work

as a fast-food worker and factory worker, and a significant number of other occupations

in the national economy. Tr. at 17-18.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence

standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The

court's review "'is more than an examination of the record for the existence of substantial

evidence in support of the Commissioner's decision'"; the court must "'also take into

account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v.

Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however,

"'merely because substantial evidence would have supported an opposite decision.'" Id.

(quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at

23

step four whether the claimant has the RFC to perform his past relevant work, if any.  If the claimant has past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant can perform the full range of work in a particular category of work defined at 20 C.F.R. § 404.1567 (very heavy, heavy, medium, light, and sedentary), the Commissioner may rely upon the Guidelines to meet her burden at step five.  The Guidelines take administrative notice of the existence of numerous unskilled occupations within each of the exertional levels.  Social Security Ruling 96-9p, 1996 WL 374185, *2. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments, such as pain or mental disorders, the ALJ must consider testimony of a VE to determine that there are jobs available in significant numbers which the claimant could perform.  Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).  A VE's identification of such jobs that an individual with the claimants' vocational factors and RFC could perform constitutes substantial evidence that the claimant is not disabled.

**Crediting Opinion of Nurse Practitioner**

Plaintiff argues that the ALJ erred in crediting Ms. Bond's December 2004 GAF assessment of 70.  Plaintiff maintains that this score is inconsistent with Ms. Bond's

24

earlier GAF assessment of 38/48. Plaintiff argues that this inconsistently obligated the ALJ to further develop the record to ascertain Ms. Bond's true opinion on the matter. This argument, however, fails to recognize that a GAF score is not a constant, like an IQ score. As the ALJ noted, the score of 38/48 was assessed at a time when Plaintiff was not on his psychiatric medications and reported that he was using methamphetamine daily.[9] Thus, a GAF of 70 in December 2004 is not inconsistent with the GAF of 38/48 assessed in July 2004. Furthermore, as the ALJ noted, it is consistent with the GAF of 60 assessed on January 19, 2004, by Dr. Zaibari, and is consistent with Plaintiff's daily activities of caring for four small children. The GAF score of 70 is also consistent with Dr. Lacey's general prognosis in March 2004.

Plaintiff also argues that Ms. Bond's December 2004 GAF assessment of 70 was inconsistent with Dr. Bacon's opinion. Plaintiff faults the ALJ for crediting the opinion of Ms. Bond, who is not an "acceptable medical source," over that of Dr. Bacon, Plaintiff's treating physician. The Commissioner argues that as Dr. Bacon was treating Plaintiff for hepatitis C, and not for mental impairments, his opinions and those of Ms. Bond were on different matters and thus, not inconsistent.

---

[9] The ALJ mistakenly stated that a GAF score of 38/48 was assessed on a number of occasions. This score was only assessed once, on July 27, 2004, although the assessment report appears numerous times in the record as part of Ms. Bond's treatment notes. Also it appears likely that the recording by Ms. Jenner of a score of 38, rather than 48, was a scrivener's error.

As the ALJ recognized, a nurse practitioner is not an "acceptable medical source" for purposes of establishing an impairment. 20 C.F.R. § 404.1513(a). However, under this regulation, a treating nurse practitioner is an important "other" medical source of information which the ALJ may consider in determining the severity of a claimant's impairment(s) and how it affects the claimant's ability to work. Id. § 404.1513(d); Douglas v. Barnhart, 130 Fed. Appx. 57, 59 (8th Cir. 2005); Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir.2003). The amount of weight given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, supportability, consistency, and specialization; generally, more weight is given to opinions of sources who have treated a claimant. 20 C.F.R. § 404.927(d).

It is true that Dr. Bacon treated and assessed Plaintiff for a physical impairment, while Ms. Bond treated and assessed mental impairments. Nevertheless, aspects of Dr. Bacon's December 6, 2004 physical RFC evaluation would seem in conflict with a GAF of 70. As noted above, Dr. Bacon opined that since June 18, 2004, Plaintiff's symptoms/side effects of the HVC treatment included frequent interference with attention and concentration needed to perform even simple work tasks. Tr. at 259-63. Significant to the discussion here, Dr. Bacon declined to offer an opinion on Plaintiff's ability to tolerate work stress. Even though Dr. Bacon was Plaintiff's treating physician, his opinion is not "inherently entitled to" controlling weight, and to the extent that Dr. Bacon's opinion contradicts Ms. Bond's on this matter, it was for the ALJ to resolve the conflict in the evidence. See Travis v. Astrue, ___ F.3d___, No. 06-2142, 2007 WL

601511, at *4; (8th Cir. Feb. 28, 2007) (holding that ALJ was justified in discrediting a treating physician's opinion, in light of a conflicting one-time medical evaluation and other conflicting evidence in the record); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). It is not the Court's task to make an independent evaluation of the facts or to reverse the ALJ's holding merely because the record contains evidence that points to an alternate outcome. Travis, 2007 WL 601511, at *4; Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir.1996). Here, there is substantial evidence supporting Ms. Bond's December 2004 GAF score of 70. In sum, the Court concludes that the ALJ did not commit reversible error in accepting Ms. Bond's GAF score of 70.

**Assessment of Plaintiff's RFC and Discrediting Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence in light of Dr. Bacon's indication that Plaintiff's limitations due to HCV and the side effects of its treatment were debilitating and could be expected to last for at least 12 months, and in light of Plaintiff's testimony and his mother's letter of March 19, 2004. Plaintiff argues that his ability to perform sporadic light activities did not mean that he could engage in full-time competitive work and was not a proper basis for discounting his subjective complaints.

A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real

people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. at 1023.

Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility with respect to the severity of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Id.

"If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). "A disability claimant's

28

subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 895 (8th Cir. 2006).

Here, the ALJ gave several valid reasons for discounting Plaintiff's testimony to the extent that Plaintiff alleged that his impairments were disabling. Notably, the ALJ relied upon the fact that Plaintiff was caring for his four young children while his wife worked. <u>See</u> <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996) (grocery shopping, driving, and daily care of children are inconsistent with claims of disabling impairments).

It is true that the ALJ did not mention the March 19, 2004 letter which Plaintiff's mother sent to his caseworker. In this letter Plaintiff's mother wrote that Plaintiff was depressed, did not like going out at all, and could not deal with the real world. However, this letter was written at a time when Plaintiff was abusing illegal drugs, and the record indicates that he improved since that time, after giving up illegal drugs and staying on his psychiatric medications. Furthermore, a letter from a disability claimant's mother corroborating the claimant's allegations of disability would be of limited probative value. <u>Cf.</u> <u>Choate v. Barnhart</u>, 457 F.3d 865, 872 (8th Cir. 2006) (corroborating testimony of an individual living with a Social Security disability insurance claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case). The Court thus concludes that this omission by the ALJ was harmless error. <u>See</u> <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 695 (8th Cir. 2003) (explaining that in the context of judicial

review of the denial of Social Security benefits, a legal error is harmless when "the ALJ would have reached the same decision denying benefits" even absent the error).

The Court notes that Dr. Bacon's opinion did not establish a disability lasting 12 months or longer. Although he wrote December 6, 2004, that Plaintiff was not a malingerer and that Plaintiff's impairments "had lasted, or could be expected to last," at least 12 months, Dr. Bacon wrote that his assessment of Plaintiff's impairment first applied of June18, 2004, and on January 4, 2005, Dr. Bacon reported that Plaintiff's HCV-related problems were resolving. Tr. at 229.

## ALJ's Reliance on the Guidelines

Plaintiff argues that the ALJ improperly relied on the Guidelines due to the restriction that Plaintiff could only perform simple work. Plaintiff argues that as a result, he could not perform the full range of light work, and that therefore, the testimony of a VE was required to establish, at step five of the sequential evaluation process, that there were jobs available in the economy which Plaintiff could perform.

This argument is without merit. A limitation to simple tasks did not require the ALJ to obtain the testimony of a VE because "unskilled work" is defined in the Commissioner's regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Therefore, a limitation to simple tasks is already contained within the unskilled limitation, and is not a limitation above and beyond that classification such as would preclude reliance on the Guidelines at step five. See Vuxta v. Comm'r of Soc. Sec., 2006 WL

2578705, at *3 (11th Cir. Sept. 8, 2006) (holding that it was proper for ALJ to rely on the

Guidelines where he determined that claimant could perform simple, unskilled work in all

exertional levels); Clark v. Massanari, 2001 WL 1024221, at *2 (9th Cir. Oct. 10, 2001)

(same).

## CONCLUSION

Upon review of the entire record, the Court concludes that the Commissioner's

decision that Plaintiff was not disabled is based upon substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**.

An appropriate Judgment shall accompany this memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 5th day of March, 2007.